BADIAK & WILL, LLP
Attorneys for Plaintiffs
106 Third Street
Mineola, New York 11501-4404
(516) 877-2225
Our Ref.: 06-P-017-RB/JK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
THE TRAVELERS as subrogee of DORSON
INC., and EDDIE BAUER, INC.; THE HARTFORD
INSURANCE CO., as subrogee of CROSS ISLAND
TRADING CO., INC.; GREAT AMERICAN
INSURANCE CO., as subrogee of DO IT BEST CORP.;
and FIREMAN'S FUND INSURANCE COMPANY as
subrogee of TRINITY GLASS INTERNATIONAL, INC.,

|  |  |
|---|---|
| Plaintiffs, | 07 CV 3104 (RPP) |

-against-

M/V "EASLINE TIANJIN," her engines, boilers, etc.,

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

- and -

KAWASAKI KISEN KAISHA, LTD., YANG MING
MARINE TRANSPORT, LTD., PHOENIX
INTERNATIONAL FREIGHT SERVICES, LTD.,
LAUFER FREIGHT LINES, LTD., APL LOGISTICS,
and HYUNDAI MERCHANT MARINE, LTD.,

Defendants.
-------------------------------------------------------------------X

Defendant KAWASAKI KISEN KAISHA, LTD. (" 'K' Line") has filed a motion to

dismiss the action on the grounds that the forum selection clause contained within its bill of

lading requires all suits to be brought in Japan before the Tokyo District Court. Plaintiffs, by

their attorneys Badiak & Will, LLP, respectfully submit that the motion should be denied, for

the reasons stated below.  For ease of the Court, attached to this Memorandum of Law are copies of the pertinent exhibits relating to the interests of the undersigned cargo claimants.

## THE DOCUMENTS

### The Waybills

"K" Line issued four "K" Line Non-Negotiable Waybills ("the waybills") to Eddie Bauer, Inc. ("Eddie Bauer"), naming the latter as consignee: waybill numbers KKLUTSNO53348A, KKLUTSNO53348B, KKLUTSNO53348C and KKLUTSNO53348D. Although each waybill contains a different description of goods, they are all identical as far as the printed terms and conditions listed on the front and reverse are concerned.

The front of the waybills (attached as Exhibit A) contain terms in small print in three different locations. Text located at the upper right portion of the waybills states in relevant part:

> "In consideration of Carrier's acceptance of [goods], the Shipper…agrees that all terms on the face and back hereof apply."

Text located in the center of the waybills states:

> "Merchant specifically agrees that its attention has been drawn to and that it has accepted the *"K" Line Combined Transport Bill of Lading ("Carrier's B/L")*, carrier's applicable tariff(s), and the CMI Uniform Rules for Sea Waybills as referred to and incorporated herein by clause 1 on the reverse hereof." [Emphasis added].

Text located in the lower left corner of the waybills states in relevant part:

> "This Waybill supersedes any prior arrangements, agreements or representations by Carrier, its agent or any other person, *save for Service Contracts* between the

2

parties, and where applicable valid under the United States Shipping Act." [Emphasis added].

The back of the waybills (attached as Exhibit B) contain three paragraphs of text. The first paragraph reads, in relevant part:

> "Unless otherwise set out on the face and back hereof, the Goods to be carried subject to the terms and conditions provided for on the back of *Carrier's Bill of Lading (Standard Form For Container Trades)* and to the terms and conditions of Cariff's applicable tariff…Every reference therein to the words 'Bill(s) of Lading' shall be understood to include reference to this Non-Negotiable Waybill and the terms and conditions thereof shall be read and construed accordingly…In accepting this Waybill, the Shipper agrees to be bound by all the stipulations…on the face and back of this Waybill and the applicable Bill of Lading…and *agrees that all agreement or freight engagement for and in connection with the carriage of the Goods are superseded by this Waybill*." [Emphasis added].

### The Service Contract

"K" Line and Eddie Bauer entered into "K" Line Service Contract – SC No. 14372 ("the Service Contract") on April 29, 2005. Signed by T.Y. Cheng, Vice President of Import Marketing/Pricing for "K" Line America and Bill Terry, Director of Transportation for Eddie Bauer, the Service Contract (attached as Exhibit C) is an eight-page document containing a list of sixteen terms and conditions plus eleven appendix terms, governing carriage of Eddie Bauer's cargoes on "K" Line's vessels for a period of twelve months, effective May 1, 2005. The Service Contract is referenced in the upper-left corner of the "K" Line waybills, by the printing of "14372."

Paragraph six of the Service Contract, entitled "Verification," states:

> "Each original Bill of Lading governing individual shipments under this Contract and all copies thereof shall

bear a notation showing the Service Contract number of this Contract..."

Paragraph eight of the Service Contract, entitled "Bill of Lading Provisions," states:

"All terms and conditions (front and back) of Carrier's applicable Bill of Lading form (Standard form for Container Trades), as effective upon cargo receipt and as contained in Carrier's Tariff at the time of receipt, shall apply to all shipments hereunder, notwithstanding any terms of this Contract."

Paragraph twelve of the Service Contract, entitled "Disputes/Applicable Law," states:

"The substantive law of the State of New York shall govern this Contract and the parties submit to the jurisdiction of the U.S. District Court for the Southern District of New York for all purposes. Any dispute shall be settled *exclusively by arbitration* at New York by a single arbitrator chosen by the parties or selected by the U.S. District Court, under the Rules of the Society of Maritime Arbitrators..." [Emphasis added].

Paragraph fourteen of the Service Contract, "Entire Contract," states:

"This Contract constitutes the *sole agreement between the parties* concerning the subject matter, and *supersedes any other agreement...*" [Emphasis added].

**Combined Transport Bill of Lading**

The "K" Line Combined Transport Bill of Lading (attached as Exhibit D) contains a

list of 30 terms. Section 2, entitled "Governing Law and Jurisdiction," states:

"The contract evidenced by or contained in this Bill of Lading shall be governed by Japanese law *except as may be otherwise provided for herein*, and any action thereunder or in connection with Carriage of Goods shall be brought before the Tokyo District Court in Japan, to whose jurisdiction Merchant irrevocably consents." [Emphasis added].

Section 4 of the Combined Transport Bill of Lading, entitled "Responsibility for Shipments to, from or through US Territories," states in relevant part:

> "With respect to Goods shipped to, from or through US Territories, Carrier's responsibilities during the entire period (and not just during Water Carriage) from the time of receipt of Goods to the time of delivery of Goods shall be governed by the United States Carriage of Goods by Sea Act (US COGSA) and US COGSA shall be deemed incorporated herein during the entire aforesaid period..."

## DISCUSSION

Foreign forum selection clauses are presumptively valid and "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972). In order to overcome this presumption of enforceability, a party which seeks to bring a suit in a forum other than the one designated by the forum selection clause must prove that: (1) the forum selection clause is invalid for fraud or overreaching; (2) the forum selection clause will deprive plaintiff of its day in court due to grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive plaintiff of a remedy; or (4) enforcement would contravene a strong public policy of the forum in which the action was brought. *Bremen,* 407 U.S. at 15-17.

### I.    Ambiguities and Contradictions Contained in the Waybills and Service Contract as Drafted by "K" Line Should Be Construed Against It

By referencing different forum selection provisions in the Combined Transport Bill of Lading and Service Contract, and by drafting contradictory language on the front and reverse

5

sides of the waybill with respect to whether the Service Contract supersedes the waybill, and additional contradictory language within the Service Contract as concerns that document's primacy in relationship to the waybills, "K" Line has introduced ambiguities into these documents that obfuscate their interpretation, both individually and in context with each other, and these ambiguities should be construed against their drafter.

"Any ambiguity in the bill of lading must be construed in favor of the shipper and against the carrier." *All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1431 (9th Cir. 1993)(quoting *Institute of London Underwriters v. Sea-Land Serv., Inc.*, 881 F.2d 761, 767 (9th Cir. 1989)). Ambiguous clauses are construed against their drafters. *Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231, 1232 (11th Cir. 1985). At this juncture, it may be observed that the waybills make reference to two, apparently entirely distinct bills of lading -- the front refers to the "K" Line Combined Transport Bill of Lading ("Carrier's B/L"); the back refers to Carrier's Bill of Lading (Standard Form for Container Trades).

Glaring contradiction also present themselves in the waybills and Service Contract: the front side of the waybills states that the waybill supersedes prior agreements by Carrier, "save for Service Contracts between the parties," while the back side of the waybills states "all agreement or freight engagement for and in connection with the carriage of the Goods are superseded by this waybill."

Finally, whereas paragraph eight of the Service Contract states that the terms and conditions of the "Standard form for Container Trades" shall apply to all shipments, notwithstanding any terms of the Service Contract, paragraph fourteen states that the Service Contract constitutes the "sole agreement between the parties…," superseding any other agreement.

As quoted to earlier, the Service Contract contains an arbitration clause providing for arbitration of disputes in New York under the jurisdiction of the United States District Court for the Southern District of New York; the Combined Transport Bill of Lading contains two separate provisions invoking, respectively, the jurisdiction of the Tokyo District Court and the application of the Carriage of Goods by Sea Act (COGSA), U.S.C. 46, Chapter 28, §§1300-1315.

A carrier cannot unilaterally alter the terms of a contract by inserting a conflicting term into a bill of lading. *See Northern Pac. Ry. Co. v. American Trading Co.*, 195 U.S. 439, 462-63, 25 S. Ct. 84, 91-92, 49 L. Ed. 269 (1904); *Hellenic Lines, Ltd. v. Embassy of Pakistan*, 467 F.2d 1150, 1154 (2d Cir. 1972).

The United States Court of Appeals for the Second Circuit observed in *Hellenic* that to hold that language in a bill of lading should prevail over inconsistent language in a freight contract "would permit [plaintiff] to change unilaterally the terms of an already existing contract." *Hellenic*, 467 F.2d at 1154. The Court in *Hellenic* found an old United States Supreme Court case instructive on the issue, quoting from *Northern Pacific Railway Co. v. American Trading Co.*, 195 U.S. 439, 462-63, 49 L. Ed. 269, 25 S. Ct. 84 (1904):

> "It is urged that the bill of lading constitutes the sole contract. But there was a plain valid contract existing between the parties before the lead was shipped and before any bill of lading was issued. That special contract was to forward the lead by the steamship leaving Tacoma on October 30. The next day after the lead was shipped at Newark, a bill of lading was delivered to one of the clerks of the trading company, and that bill of lading contains the absolutely inconsistent statement that the carrier is not to be liable for any loss not occurring on its own road,…The railroad company has no power alone to alter that contract, and it could not alter it by simply issuing a bill of lading,

> unless the other party assented to its conditions and thereby
> made a new and different contract."

In *The Ile de Sumatra*, 286 F. 437, 439 (S.D.N.Y. 1922), this Court also rejected the argument that language in the bills of lading controlled over inconsistent language in a prior written contract:

> "The onions were shipped at Gandia under these original
> documents of June 27 and June 28, and they did not
> contradict the bills of lading subsequently signed, but
> merely explained them. They are to be treated as if written
> into the bills of lading, prevailing on familiar principles
> over conditions in the printed form which are inconsistent."

Plaintiffs respectfully submit that "K" Line, having introduced a morass of ambiguity and contradiction into its waybills, bill of lading and Service Contract with respect to the issues of forum selection and the respective supremacy of these documents, should not now be allowed to benefit from such ambiguity by claiming that clarity exists as to the selection of the forum which it deems to be proper. Whether the result of its own design or merely careless drafting, the convoluted references and contradictory assertions contained within "K" Line's documents should be construed against it.

## II.    The Language of the Waybill Forum Selection Clause is Permissive, not Mandatory, and Should not be Enforced

The language of the waybill forum selection clause which "K" Line contends vests jurisdiction in Japanese courts is permissive, not mandatory, and thus should not be enforced.

A forum selection need not be enforced unless it is, on its face, mandatory. *New York Marine & Gen. Ins. Co. v. M/V Admiralengracht*, 1999 U.S. Dist. LEXIS 6152, *4-5,

(S.D.N.Y. 1999); *Bison Pulp & Paper Ltd. v. M/V Pergamos*, 1996 AMC 2022 (S.D.N.Y.

1995).To be enforceable, a forum selection clause must contain language that is "mandatory

rather than permissive." *Boutari v. Attiki Importers and Distributors, Inc.*, 22 F.3d 51, 52-53

(2d Cir. 1994). The general rule is that where parties only specify in a contract clause where

jurisdiction is proper, that clause "will generally not be enforced without some further

language indicating the parties' intent to make jurisdiction exclusive." *Id. (quoting*

*Docksider, Ltd. v. Sea Technology, Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989)).

In *Boutari*, the parties had entered into an agreement containing a forum selection

clause stating:

> "This Agreement shall be governed and construed according to the
> Laws of Greece. Any dispute arising between the parties hereunder
> shall come within the jurisdiction of the competent Greek Courts,
> specifically of the Thessaloniki Courts." *Boutari*, 22 F.3d 51, 52.

In holding the clause permissive in nature, the *Boutari* Court observed: "An

agreement conferring jurisdiction in one forum will not be interpreted as excluding

jurisdiction elsewhere unless it contains specific language of exclusion…" *Id.* at 53 (quoting

Judge Weinfeld in *City of New York v. Pullman, Inc.*, 477 F. Supp. 438, 442 n.11 (S.D.N.Y.

1979)).

In contrast, in *Asoma Corp. v. M/V Southgate*, 2000 AMC 399 (S.D.N.Y. 1999), a

case involving whether a forum selection clause contained within a bill of lading was

enforceable, the clause at issue read:

> "The claims arising from or in connection with or relating to this
> Bill of Lading shall be *exclusively* governed by the law of Korea
> except otherwise provided in this Bill of Lading. Any and all
> action concerning custody or carriage under this Bill of Lading
> whether based on breach of contract, tort or otherwise shall be

9

brought before the Seoul Civil District Court in Korea." [Emphasis added].

At the outset of its analysis, the Court in *Asoma* described the clause's language as mandatory and exclusive and thus presumptively valid and applicable to that action, unless one of the four *M/V Bremen* exceptions was found to apply. *Id.* at \*4.

In this case, Paragraph 2 of the "K" Line Combined Transport Bill of Lading states:

> "The contract evidenced by or contained in this Bill of Lading shall be governed by Japanese law except as may be otherwise provided for herein, and any action thereunder or in connection with Carriage of Goods shall be brought before the Tokyo District Court in Japan, to whose jurisdiction Merchant irrevocably consents."

The above-quoted language merely constitutes plaintiff's accession to jurisdiction in Japan. No language contained in the clause states that such accession to Japanese jurisdiction is to the exclusion of plaintiff's submission to other jurisdictions. There is no rule in the Second Circuit that exclusive jurisdiction is conferred solely by a contract term specifying which courts "shall have jurisdiction." *Steve Weiss & Co., Inc. v. Inalco, S.P.A.*, 1999 U.S. Dist. LEXIS 8811, \*4 (S.D.N.Y. 1999). The *Boutari* Court observed: "Although the word 'shall' is a mandatory term, here it mandates nothing more than that the [Greek courts] have jurisdiction." *Boutari*, 22 F.3d 51, 53.

Plaintiffs respectfully submit that, as contained in the forum selection clause in Paragraph 2 of the "K" Line Combined Transport Bill of Lading, the word "shall," standing alone without the aid of additional language of exclusivity, is permissive in nature and thus the clause taken as a whole is not mandatory and should not be enforced.

### III.    The Service Contract, as a Valid Contract Incorporated by the Waybills, Governs the Contract of Carriage as Between "K" Line and Eddie Bauer

It is undisputed that "K" Line and Eddie Bauer signed a valid service contract governing the carriage of goods between the two parties. In addition, the waybills incorporate the terms of the service contract by referencing the service contract number, "14372," in their upper-left corner, as required by paragraph six of the Service Contract. The lower left of the waybills states: "This Waybill supersedes any prior arrangements, agreements or representations by Carrier, its agent or any other person, *save for Service Contracts* between the parties [emphasis added]." "The bill of lading will be found to incorporate an arbitration clause contained in the charterparty and will be made subject to it when the bill clearly refers to the charterparty and the holder of the bill has either actual or constructive notice of the incorporation." *Midland Tar Distillers, Inc. v. M/T LOTOS*, 362 F. Supp. 1311, 1313 (S.D.N.Y. 1973).

In general, bills of lading are contracts of carriage between the shipper and carrier. *See Porky Prods. v. Nippon Express U.S.A.*, 1 F. Supp. 227, 230 (S.D.N.Y. 1997) (citing *International Knitwear Co. v. M/V ZIM CANADA*, 1994 U.S. Dist. LEXIS 14180, (S.D.N.Y. Oct. 6, 1994)), *aff'd*, 152 F.3d 920 (2d Cir. 1998). But where the parties' relationship is governed by a separate contact, that contract acts as the contract of carriage and bills of lading are "mere receipts." *Associated Metals & Minerals Corp. v. S/S Jasmine*, 983 F.2d 410, 413 (2d Cir. 1993) (listing cases); *Eastern Fish Co. v. South Pac. Shipping Co.*, 105 F. Supp. 2d 234, 238-39 (S.D.N.Y. 2000) (upholding an arbitration clause contained in a

Service Contract despite the existence of a conflicting forum selection clause in a bill of lading).

In *Eastern Fish*, the Court wrestled with the question whether a Service Contract superseded a bill of lading for jurisdictional purposes. The Service Contract contained the following language:

> "*Except as otherwise expressly provided herein,* all cargo shipped under this Service Contract shall be subject to carrier's governing tariff(s) in effect at the time of shipment and all applicable rules, regulations, terms, and conditions contained in carrier's bills of lading issued for such cargo. All provisions of such tariff(s) and bills of lading are hereby incorporated in this Service Contract." [Emphasis added]. *Eastern Fish*, 105 F. Supp. 2d at 238.

In analyzing the above-quoted language, the Court held that the phrase "except as otherwise expressly provided herein" indicated that where there was express language in the Service Contract that conflicted with the bill of lading, the language of the Service Contract controlled. It was according to this logic that the Court held that, because the arbitration clause was an express provision of the Service Contract, the Service Contract would not be subject to contrary forum selection terms and conditions of a bill of lading. *Id.* at 238.

Paragraph 2 of the Service Contract between "K" Line and Eddie Bauer, entitled "Governing Tariffs," states:

> "All cargoes moving hereunder, *unless otherwise provided herein,* shall be subject to the common group rates, charges or rules as applicable at time of shipment contained in the governing 'K' Line Tariff(s) listed on the signature page of the contract." [Emphasis added].

The language quoted above from the Service Contract between "K" Line and Eddie Bauer is strikingly similar to that present in the Service Contract at

issue in *Eastern Fish*. The arbitration clause contained in paragraph twelve of the

Service Contract in this case is clearly an express provision at odds with the terms

of the "K" Line waybills and bills of lading. Plaintiffs respectfully submit that, on

the basis of longstanding Second Circuit doctrine, it is the Service Contract, not

the waybills or bills of lading, which governs the contract of carriage as between

"K" Line and Eddie Bauer.


IV.    **The Arbitration Clause Contained Within the Service Contract Signed By "K" Line and Eddie Bauer is a Valid Contract Between the Parties and Should be Enforced Accordingly**

Federal courts have long acknowledged that federal policy favors arbitration as a

means of dispute resolution. *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am.*

*Corp.*, 246 F.3d 219, 226 (2d Cir. 2001). This federal policy in favor of arbitration applies

with special force in the field of international commerce. *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

The determination of whether a dispute is arbitrable under the Federal Arbitration Act

(9 U.S.C. §§1-14) comprises two questions: (1) whether there exists a valid agreement to

arbitrate under the contract in question, and if so, (2) whether the particular dispute sought to

be arbitrated falls within the scope of the arbitration agreement. *Hartford Acc. & Indem. Co.*

*v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001).

To find a valid agreement to arbitrate, a court must apply the "generally accepted

principles of contract law." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.

1987). It is well established that "arbitration is a matter of contract and a party cannot be

13

required to submit to arbitration any dispute which he has not agreed to so submit." *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). Thus, under general contract principles, "a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation." *Genesco,* 815 F.2d. at 845. A court should consider only "whether there was an objective agreement with respect to the entire contract." *Id.* at 846.

"The Arbitration Act establishes that, as a matter of law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, (1983). Where the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability. *Ace Capital Re Overseas Ltd., v. Central United Life Insurance Company,* 307 F.3d 24, 29 (2d Cir. 2002).

The Service Contract between "K" Line and Eddie Bauer refers to arbitration in two locations: on the first page of the document, and in paragraph twelve. The first page of the Service Contract states:

> "This Service Contract ("Contract") is made and concluded
> this day of April 29, 2005, by and between "K" Line, an
> ocean common carrier ("Carrier") and Eddie Bauer
> Fulfillment Services, Inc. (hereinafter "Shipper"), whereby
> the parties mutually agree as set forth in Appendix A –
> attached hereto. IN WITNESS WHEREOF, the parties
> have executed this Contract through their responsible
> representatives duly authorized as of the dates hereinafter

written, **SUBJECT TO ARBITRATION CLAUSE IN CLAUSE XII.**" [So emphasized in the original].

Paragraph twelve of the Service Contract contains an arbitration provision stipulating arbitration of any disputes in New York. In addition, it is worth noting that the arbitration clause in paragraph twelve contains language of exclusivity that is notably absent from the language referencing Japanese jurisdiction in the "K" Line Combined Transport Bill of Lading. To wit, the arbitration clause states in relevant part:

> "The substantive law of the State of New York shall govern this Contract and the parties submit to the jurisdiction of the U.S. District Court for the Southern District of New York for all purposes. Any dispute shall be settled *exclusively* by arbitration at New York by a single arbitrator chosen by the parties or selected by the U.S. District Court." [Emphasis added].

Furthermore, the reference made in the arbitration clause to "any dispute" is clearly broad enough to encompass the subject matter of the instant litigation. "Arbitration should be ordered 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *SA Mineracao de Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir. 1984) (quoting *Wire Service Guild v. United Press Int'l*, 623 F.2d 257, 260 (2d Cir. 1980) (quoting *International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. General Electric Co.*, 406 F.2d 1046, 1048 (2d Cir. 1969))).

Because the Service Contract's arbitration provision, stipulating arbitration of any disputes in New York as the exclusive remedy for dispute resolution, was incorporated as part of a valid contract entered into between "K" Line and Eddie Bauer, it should be enforced accordingly.

15

**V.**    **Because Section 4 of the "K" Line Combined Transport Bill of Lading States that "US COGSA" Governs "K" Line's Responsibilities for Shipments to, from or through U.S. Territories, the Instant Court is a Legitimate and Proper Forum for the Resolution of This Action**

Section 4 of the "K" Line Combined Transport Bill of Lading incorporates U.S.C. 46, Chapter 28, §§1300-1315, the Carriage of Goods by Sea Act ("COGSA"), and states, in relevant part:

> "With respect to Goods shipped to, from or through US Territories, Carrier's responsibilities during the entire period…shall be governed by the United States Carriage of Goods by Sea Act (US COGSA) and US COGSA shall be deemed incorporated herein during the entire aforesaid period…"

Plaintiffs observe that section 4's reference to "US COGSA" is apparently designed to draw a distinction between it and "Japan COGSA," referred to in section 3(A) of the Combined Transport Bill of Lading, and, according to its terms, applicable to all trade other than to, from or through the United States (and thus inapplicable in this case).

It defies logic and belief for defendant to claim that, although its Bill of Lading incorporates COGSA with respect to shipments made to or from the United States, by making an explicit reference to "US COGSA," the courts of the United States are incompetent to hear actions brought under COGSA, and only the Tokyo District Court, apparently applying "US COGSA," may do so.

Article III, Section 2 of the United States Constitution vests federal courts with jurisdiction over admiralty cases; therefore, subject matter jurisdiction exists in the instant

16

case. It is undisputed that "K" Line does business in New York; therefore, there is personal jurisdiction.

Plaintiffs respectfully submit that because of the explicit reference made in Paragraph 4 of the "K" Line Combined Transport Bill of Lading regarding COGSA's application in shipments to or from the United States, defendant has impliedly acceded to jurisdiction in United States Federal Courts.

Accordingly, even if one were to concede that the Tokyo District Court, applying U.S. COGSA, was an appropriate forum in which the instant action may be litigated, plaintiffs submit that it is merely one valid forum in which to litigate disputes, and not the sole appropriate forum, as contended by the defendant.

Plaintiffs filed suit against defendant "K" Line in the United States District Court for the Southern District of New York within COGSA's one-year time limit for the filing of such suits. U.S.C. 46, Chapter 28, §1303 (6). Because the instant action was commenced in accordance with COGSA's timeliness requirements, in a valid forum for litigating plaintiff's rights under COGSA, defendant's motion to dismiss should be denied.

## VI.    By Filing Cross-Claims in the Instant Suit, "K" Line Has Impliedly Waived Its Right to Enforce the Japan Jurisdiction Clause

Plaintiffs respectfully submit that by filing cross-claims in the instant action, "K" Line has impliedly waived its right to enforce the forum selection clause in the Combined Transport Bill of Lading stipulating the application of Japanese Jurisdiction.

Where a party has repeatedly represented that venue is appropriate or has actively pursued substantive motions, courts have found implied waiver of venue. *Ferraro Foods,*

*Inc. v. M/A Izzet Incekara*, 2001 U.S. Dist. LEXIS 12338, 2001 WL 940562, at *4 (S.D.N.Y. 2001).

WHEREFORE, for the aforementioned reasons, plaintiffs pray defendant's motion to dismiss be denied. In the event this Court decides to grant defendant's motion to dismiss, plaintiffs respectfully request that the Court retain jurisdiction over the case and place the action in suspense, so that, after a judgment has been rendered by the Tokyo District Court, plaintiffs may prevail upon this Court to review the decision of the Japanese court in order to ensure that plaintiffs' rights under COGSA have not been diminished or undermined.

DATED:    Mineola, New York
          November 9, 2007

Yours, etc.

BADIAK & WILL, LLP
Attorneys for Plaintiffs
106 Third Street
Mineola, New York 11501-4404
(516) 877-2225

By: _____
James P. Krauzlis (JPK-4972)

TO:

Edward A. Keane, Esq.
Mahoney & Keane, LLP
111 Broadway, 10th Floor
New York, New York 10006
(212) 385-1422

18

Christopher H. Mansuy, Esq.
DeOrchis, Wiener & Partners, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Paul M. Keane, Esq.
Cichanowicz, Callan, Keane, Vengrow & Textor, LLP
61 Broadway, Suite 3000
New York, New York 10006
(212) 344-7042

John D. Kimball, Esq.
Blank Rome
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

# **EXHIBIT A**

WAYBILL NO NEGOTIABLE COPY

Waybill Number: KKLUTSN053348B

| SHIPPER | |
|---|---|
| ECMS O/B NASIGN COMPANY LIMITED. 91-18 KUNJA-DONG,KWANG JIN-KU SEOUL KOREA TEL:02-460-2752 | EXPORT REFERENCES |

BKG# =

14372

| CONSIGNEE | FORWARDING AGENT-REFERENCES    FMC#-    CHB#- |
|---|---|
| EDDIE BAUER INC 15010 N.E. 36TH STREET REDMOND, WA 98052 USA TEL: 425-755-6100 | |

POINT AND COUNTRY OF ORIGIN

| NOTIFY PARTY | |
|---|---|
| EXPEDITORS INTERNATIONAL OF WASHING TON INC. 19119-16TH AVENUE SOUTH SEATAC,WA 98188 TEL: 206-826-4133 FAX: 206-835-1419  CTC: MACHEAL GAMBLE | |

| PRE-CARRIAGE | PLACE OF RECEIPT XINGANG,,CN    CY | In consideration of Carrier's acceptance of Containers or packages, the Shipper (on its own behalf and on behalf of all persons included in the definition of "Merchant" contained in the "K" Line Combined Transport Bill of Lading) agrees that all terms on the face and back hereof apply. |
|---|---|---|
| VESSEL/VOYAGE    V. 192 EASLINE TIANJIN | PORT OF LOADING XINGANG,,CN | |
| PORT OF DISCHARGE SEATTLE,WA,US | PLACE OF DELIVERY COLUMBUS,OH,US    DOOR | FINAL DESTINATION (FOR MERCHANT'S REFERENCE ONLY) SEE CLAUSE 7(2) |

PARTICULARS FURNISHED BY SHIPPER    PAGE 1 OF 2

| CONTAINER & SEAL NO. | NO. OF PKGS. | HM  DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| KKFU1180034    DA29934 | | (49 CTNS) LEATHER GARMENTS 1/3 PART OF CARGO IN KKFU1180034SHIPPER ADVISES SHIPMENT CONTAINS NO SWPM | 1,020 KGS | 7.520 M |
| | | | 1,020 KGS | 7.520 M |
| | | SHIPPERS LOAD AND COUNT Receipt:CY Delivery:DOOR | | |
| | | MERCHANT SPECIFICALLY AGREES THAT ITS ATTENTION HAS BEEN DRAWN TO AND THAT IT HAS ACCEPTED THE "K" LINE COMBINED TRANSPORT BILL OF LADING ("CARRIER'S B/L"), CARRIER'S APPLICABLE TARIFF(S), AND THE CMI UNIFORM RULES FOR SEA WAYBILLS AS REFERRED TO IN AND INCORPORATED HEREIN BY CLAUSE 1 ON THE REVERSE HEREOF | | |

These Commodities,Technologies or Software were Exported from the United States in Accordance with Export Administration Regulations. Diversion Contrary to U.S. Law Prohibited.

DECLARED VALUE $    IF SHIPPER ENTERS A VALUE, THE AD VALOREM RATE WILL BE CHARGED (SEE CLAUSE 24).

| FREIGHT AND CHARGES | REV. BASIS | RATE/PER | PREPAID | COLLECT |
|---|---|---|---|---|
| FREIGHT COVERED BY B/L NO.KKLUTSN053348A | | | | |
| DOC FEE | 1 | CNY115/BL | CNY115.00 | |
| CARGO DECLARATION | 1 | USD25/BL | | USD25.0 |
| | | TOTAL | CNY115.00 | USD25.0 |

| DATE EX RATE 07-Jul-06 USD0.1251(CNY) | ZERO(0) | PAYABLE AT COLUMBUS | PLACE & DATE OF ISSUE |
|---|---|---|---|
| | | PREPAID AT TIANJINXINGANG | TIANJINXINGANG KAWASAKI KISEN KAISHA, LTD. ON ITS OWN BEHALF AND ON BEHALF OF THE VESSEL, HER OWNERS, OPERATORS AND CHARTERERS. |

RECEIVED by Carrier from the Shipper on the terms hereof the total number of Containers or packages said to contain Goods enumerated below in the box marked "Total No. of Containers or Packages (in words)" in apparent good order and condition (unless otherwise indicated herein) for Carriage from the Place of Receipt or the Port of Loading to the Port of Discharge or the Place of Delivery. This Waybill supersedes any prior arrangements, agreements or representations by Carrier, its agent or any other person, save for service contracts between the parties, and where applicable valid under the United States Shipping Act.

NON-NEGOTIABLE(COPY)

By

Total No. of Containers or Packages (in words) ONE(1) CONTAINER(S) ONLY

FORM KL002(8/0)

"K"Line America, Inc., as Agents for Carrier Kawasaki Kisen Kaisha, Ltd.

| | |
|---|---|
| **SHIPPER** | **WAYBILL N 1-NEGOTIABLE** |
| ECMS O/B NASIGN COMPANY LIMITED. 91-18 KUNJA-DONG,KWANG JIN-KU SEOUL KOREA TEL:02-460-2752 | KKLUTSN053348A |

| CONSIGNEE | FORWARDING AGENT-REFERENCES  FMC#-  CHB#- |
|---|---|
| EDDIE BAUER INC 15010 N.E. 36TH STREET REDMOND, WA 98052 USA TEL: 425-755-6100 | |

14372

EXPORT REFERENCES

BKG# =

| NOTIFY PARTY | POINT AND COUNTRY OF ORIGIN |
|---|---|
| EXPEDITORS INTERNATIONAL OF WASHING TON INC. 19119-16TH AVENUE SOUTH SEATAC,WA 98188 TEL: 206-826-4133 FAX: 206-835-1419 CTC: MACHEAL GAMBLE | |

| PRE-CARRIAGE | PLACE OF RECEIPT XINGANG,,CN    CY | In consideration of Carrier's acceptance of Containers or packages, the Shipper(on its own behalf and on behalf of all persons included in the definition of "Merchant" contained in the "K" Line Combined Transport Bill of Lading) agrees that all terms on the face and back hereof apply,(p.t.o) |
|---|---|---|
| VESSEL/VOYAGE  V. 192 | PORT OF LOADING XINGANG,,CN | |
| EASLINE TIANJIN | | |
| PORT OF DISCHARGE | PLACE OF DELIVERY | FINAL DESTINATION (FOR MERCHANT'S REFERENCE ONLY) SEE CLAUSE 7(2) |
| SEATTLE,WA,US | COLUMBUS,OH,US    DOOR | |

PARTICULARS FURNISHED BY SHIPPER                                PAGE 1 OF 2

| CONTAINER & SEAL NO. | NO. OF PKGS. | HM  DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| KKFU1180034  DA29934 KKFU1456631  DA29935 | | (299 CTNS) LEATHER GARMENTS 1/3 PART OF CARGO IN KKFU1180034SHIPPER ADVISES SHIPMENT CONTAINS NO SWPM | 4,181.5 KGS | 90.190 M3 |
| | | SHIPPERS LOAD AND COUNT | 4,181.5 KGS | 90.190 M3 |
| | | Receipt:CY Delivery:DOOR | | |
| | | MERCHANT SPECIFICALLY AGREES THAT ITS ATTENTION HAS BEEN DRAWN TO AND THAT IT HAS ACCEPTED THE "K"LINE COMBINED TRANSPORT BILL OF LADING ("CARRIER'S B/L") CARRIER'S APPLICABLE TARIFF(S), AND THE CMI UNIFORM RULES FOR SEA WAYBILLS AS REFERRED TO IN AND INCORPORATED HEREIN BY CLAUSE 1 ON THE REVERSE HEREOF. | | |

These Commodities,Technologies or Software were Exported from the United States in Accordance with Export Administration Regulations. Diversion Contrary to U.S. Law Prohibited.

| DECLARED VALUE $ | IF SHIPPER ENTERS A VALUE, THE AD VALOREM RATE WILL BE CHARGED (SEE CLAUSE 24). | | | | |
|---|---|---|---|---|---|
| FREIGHT AND CHARGES | REV. BASIS | RATE/PER | PREPAID | | COLLECT |
| | | | | | |

| DATE | | PAYABLE AT | PLACE & DATE OF ISSUE |
|---|---|---|---|
| EX RATE | ZERO(0) | | TIANJINXINGANG KAWASAKI KISEN KAISHA, LTD, ON ITS OWN BEHALF AND ON BEHALF OF THE VESSEL, HER OWNERS, OPERATORS AND CHARTERERS. |
| | | PREPAID AT | |

RECEIVED by Carrier from the Shipper on the terms hereof the total number of Containers or packages said to contain Goods enumerated below in the box marked "Total No. of Containers or Packages (in words)" in apparent good order and condition (unless otherwise indicated herein) for Carriage from the Place of Receipt or the Port of Loading to the Port of Discharge or the Place of Delivery. This Waybill supersedes any prior arrangements, agreements or representations by Carrier, its agent or any other person, save for such service contracts between the parties, and where applicable valid under the United States Shipping Act. 

By  NON-NEGOTIABLE(COPY)

Total No. of Containers or Packages (in words) TWO(2) CONTAINER(S) ONLY

FORM KL062(6/3)

"K"Line America, Inc., as Agents for Carrier Kawasaki Kisen Kaisha, Ltd.

KL062 (1)

WAYBILL NON-NEGOTIABLE COPY

SHIPPER

ECMS O/B FOWNES BROS. & CO.,INC.
16 EAST 34 STREET 5 FLOOR NEW YORK,
N.Y. 10016

14372

Waybill Number
KKLUTSN053348C

EXPORT REFERENCES

BKG# =

CONSIGNEE

EDDIE BAUER INC
15010 N.E. 36TH STREET REDMOND, WA
98052 USA TEL: 425-755-6100

FORWARDING AGENT-REFERENCES    FMC#-    CHB#-

POINT AND COUNTRY OF ORIGIN

NOTIFY PARTY

EXPEDITORS INTERNATIONAL OF WASHING
TON INC.
19119-16TH AVENUE SOUTH SEATAC,WA
98188 TEL: 206-826-4133 FAX:
206-835-1419 CTC: MACHEAL GAMBLE

| PRE-CARRIAGE | PLACE OF RECEIPT | | In consideration of Carrier's acceptance of Containers or packages, the Shipper (on its own behalf and on behalf of all persons included in the definition of "Merchant" contained in the "K" Line Combined Transport Bill of Lading) agrees that all terms on the face and back hereof apply. |
| | XINGANG,,CN | CY | |
| VESSEL/VOYAGE    V. 192 | PORT OF LOADING | | |
| EASLINE TIANJIN | XINGANG,,CN | | |
| PORT OF DISCHARGE | PLACE OF DELIVERY | | FINAL DESTINATION (FOR MERCHANT'S REFERENCE ONLY) SEE CLAUSE 7(2) |
| SEATTLE,WA,US | COLUMBUS,OH,US | DOOR | |

PARTICULARS FURNISHED BY SHIPPER    PAGE 1 OF 2

| CONTAINER & SEAL NO. | NO. OF PKGS. | HM | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
| KKFU1180034    DA29934 | | | | | |
| | | | (7 CTNS)
100% MERINO WOOL WOVEN SCARF
1/3 PART OF CARGO IN
KKFU1180034SHIPPER ADVISES SHIPMENT
CONTAINS NO SWPM | 63 KGS | .030 M |
| | | | SHIPPERS LOAD AND COUNT
Receipt:CY
Delivery:DOOR | 63 KGS | .030 M |
| | | | MERCHANT SPECIFICALLY AGREES THAT ITS ATTENTION HAS BEEN DRAWN TO AND THAT IT HAS ACCEPTED THE "K" LINE COMBINED TRANSPORT BILL OF LADING ("CARRIER'S B/L"), CARRIER'S APPLICABLE TARIFF(S), AND THE CMI UNIFORM RULES FOR SEA WAYBILLS AS REFERRED TO IN AND INCORPORATED HEREIN BY CLAUSE 1 ON THE REVERSE HEREOF | | |

These Commodities,Technologies or Software were Exported from the United States in Accordance with Export Administration Regulations. Diversion Contrary to U.S. Law Prohibited.

DECLARED VALUE $    IF SHIPPER ENTERS A VALUE, THE AD VALOREM RATE WILL BE CHARGED (SEE CLAUSE 24).

| FREIGHT AND CHARGES | REV. BASIS | RATE/PER | PREPAID | COLLECT |
| FREIGHT COVERED BY B/L NO.KKLUTSN053348A | | | | |
| DOC FEE | 1 | CNY115/BL | CNY115.00 | |
| CARGO DECLARATION | 1 | USD25/BL | | USD25.0 |
| | | TOTAL | CNY115.00 | USD25.0 |

| DATE | | PAYABLE AT | PLACE & DATE OF ISSUE |
| EX RATE | | COLUMBUS | |
| 07-Jul-06 | ZERO(0) | | TIANJINXINGANG |
| USD0.1251(CNY) | | PREPAID AT | KAWASAKI KISEN KAISHA, LTD. ON ITS OWN BEHALF |
| | | TIANJINXINGANG | AND ON BEHALF OF THE VESSEL, HER OWNERS, |
| | | | OPERATORS AND CHARTERERS. |

RECEIVED by Carrier from the Shipper on the terms hereof the total number of Containers or packages said to contain Goods enumerated below in the box marked "Total No. of Containers or Packages (in words)" in apparent good order and condition (unless otherwise indicated herein) for Carriage from the Place of Receipt or the Port of Loading to the Port of Discharge or the Place of Delivery.This Waybill supersedes any prior arrangements, agreements or representations by Carrier, its agent or any other person, save for service contracts between the parties, and where applicable valid under the United States Shipping Act.

Total No. of Containers or Packages (in words)ONE(1) CONTAINER(S) ONLY

FORM KL002(6/3)

By    NON-NEGOTIABLE(COPY)

"K"Line America, Inc., as Agents for
Carrier Kawasaki Kisen Kaisha, Ltd.

KKLUTSN053348D

| SHIPPER | | |
|---|---|---|
| ECMS O/B NASIGN COMPANY LIMITED.<br>91-18 KUNJA-DONG,KWANG JIN-KU SEOUL<br>KOREA TEL:02-460-2752 | | EXPORT REFERENCES<br><br>258 |

BKG# =

14372

| CONSIGNEE | FORWARDING AGENT-REFERENCES | FMC#- | CHB#- |
|---|---|---|---|
| EDDIE BAUER INC<br>15010 N.E. 36TH STREET REDMOND, WA<br>98052 USA TEL: 425-755-6100 | | | |

POINT AND COUNTRY OF ORIGIN

| NOTIFY PARTY | |
|---|---|
| EXPEDITORS INTERNATIONAL OF WASHING<br>TON INC.<br>19119-16TH AVENUE SOUTH SEATAC,WA<br>98188 TEL: 206-826-4133 FAX:<br>206-835-1419 CTC: MACHEAL GAMBLE | |

| PRE-CARRIAGE | PLACE OF RECEIPT | | In consideration of Carrier's acceptance of Containers or packages, the Shipper (on its own behalf and on behalf of all persons included in the definition of "Merchant" contained in the "K" Line Combined Transport Bill of Lading) agrees that all terms on the face and back hereof apply. |
|---|---|---|---|
| | XINGANG,,CN | CY | |
| VESSEL/VOYAGE     V. 192 | PORT OF LOADING | | |
| EASLINE TIANJIN | XINGANG,,CN | | |
| PORT OF DISCHARGE | PLACE OF DELIVERY | | FINAL DESTINATION (FOR MERCHANT'S REFERENCE ONLY) SEE CLAUSE 7(2) |
| SEATTLE,WA,US | COLUMBUS,OH,US | DOOR | |

PARTICULARS FURNISHED BY SHIPPER

PAGE 1 OF 2

| CONTAINER & SEAL NO. | NO. OF PKGS. | HM  DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| KKFU1643904     DA29872 | | | | |
| | | (258 CTNS)<br>LEATHER GARMENTSSHIPPER ADVISES<br>SHIPMENT CONTAINS NO SWPM | 4,386 KGS | 48 M: |
| | | SHIPPERS LOAD AND COUNT<br><br>Receipt:CY<br>Delivery:DOOR | 4,386 KGS | 48 M: |
| | | MERCHANT SPECIFICALLY AGREES THAT ITS ATTENTION HAS BEEN DRAWN TO AND THAT IT HAS ACCEPTED THE "K" LINE COMBINED TRANSPORT BILL OF LADING ("CARRIER'S BIL"), CARRIER'S APPLICABLE TARIFF(S), AND THE CMI UNIFORM RULES FOR SEA WAYBILLS AS REFERRED TO IN AND INCORPORATED HEREIN BY CLAUSE 1 ON THE REVERSE HEREOF | | |

These Commodities, Technologies or Software were Exported from the United States in Accordance with Export Administration Regulations. Diversion Contrary to U.S. Law Prohibited.

| DECLARED VALUE $ | | IF SHIPPER ENTERS A VALUE, THE AD VALOREM RATE WILL BE CHARGED (SEE CLAUSE 24). | | | |
|---|---|---|---|---|---|
| FREIGHT AND CHARGES | REV. BASIS | RATE/PER | PREPAID | COLLECT | |
| OCEAN FRT() | 1 | USD3,855/P40 | | | USD3,855.00 |
| FAF | 1 | USD680/P40 | | | USD680.00 |
| LOAD PORT ISPS SEC | 1 | USD6/P40 | | | USD6.00 |
| INLAND FUEL CHARGE | 1 | USD50/P40 | | | USD50.00 |
| THC | 1 | CNY560/P40 | CNY560.00 | | |
| DOC FEE | 1 | CNY115/BL | CNY115.00 | | |
| CARGO DECLARATION | 1 | USD25/BL | | | USD25.00 |
| | | FREIGHT COLLECT TOTAL | CNY675.00 | | USD4,616.00 |

| DATE | | PAYABLE AT | PLACE & DATE OF ISSUE |
|---|---|---|---|
| EX RATE | | COLUMBUS | TIANJINXINGANG |
| 07-Jul-06<br>USD0.1251(CNY) | ZERO(0) | | KAWASAKI KISEN KAISHA, LTD. ON ITS OWN BEHALF<br>AND ON BEHALF OF THE VESSEL, HER OWNERS,<br>OPERATORS AND CHARTERERS. |
| | | PREPAID AT<br>TIANJINXINGANG | |

RECEIVED by Carrier from the Shipper on the terms hereof the total number of Containers or packages said to contain Goods enumerated below in the box marked "Total No. of Containers or Packages (in words)" in apparent good order and condition (unless otherwise indicated herein) for Carriage from the Place of Receipt or the Port of Loading to the Port of Discharge or the Place of Delivery, the Weight supersedes any prior arrangements, agreements or representations by Carrier, its agent or any other person, save for service contracts between the parties, and where applicable valid under the United States Shipping Act.

Total No. of Containers or Packages (in words):ONE(1) CONTAINER(S) ONLY

FORM KL002(8/3)

By   NON-NEGOTIABLE(COPY)

"K" Line America, Inc., as Agents for
Carrier Kawasaki Kisen Kaisha, Ltd.

## EXHIBIT B

1. Unless otherwise set forth herein, the acceptance by the Goods to be carried subject to the terms and conditions provided for on the back of Carrier's BILL OF LADING (Standard Form For Container Trades) and to the terms and conditions of Carrier's applicable tariff, both as effective on the date of cargo receipt, copies of which may be seen at "K" Line America, Inc., 8730 Stony Point Parkway, Suite 400, Richmond, VA 23235, Manager, Export Services. Every reference therein to the words "Bill(s) of Lading" shall be understood to include reference to this Non-Negotiable Waybill and the terms and conditions thereof shall be read and construed accordingly.

In accepting this Waybill, the Shipper agrees to be bound by all the stipulations, exceptions, terms and conditions on the face and back of this Waybill and the applicable Bill of Lading, whether written, typed, stamped or printed, as fully as if signed by the Shipper, any local custom or privilege to the contrary notwithstanding, and agrees that all agreement or freight engagement for and in connection with the carriage of the Goods are superseded by this Waybill.

2. Except as otherwise specifically provided in this Waybill, delivery of the Goods will be made only to the Consignee named on the face hereof, or his authorized agents, on production of proof of identity. Notice of arrival of the Goods will, in the absence of other instructions, be sent to the Consignee, or the person to be notified by ordinary methods. The Carrier is not liable for non-receipt or delay in the dispatch of such notice.

3. (1) Should the Shipper require delivery elsewhere than at the place of delivery or the port of discharge as shown on the face hereof and should written instruction be given by the Shipper to the Carrier or his agents, the Carrier may at his discretion, deliver the Goods at the place elsewhere than at the place of delivery or the port of discharge as shown on the face hereof.

(2) Should the Consignee require delivery elsewhere than at the place of delivery or the port of discharge as shown on the face hereof and should written instruction be given by the Consignee to the Carrier or his agents, the Carrier may at his discretion, without any notice to the Shipper deliver the Goods at the place elsewhere than at the place of delivery or the port of discharge as shown on the face hereof.

(3) Should delivery be required to be made to a party other than that named as the Consignee, authorization must be given in writing by the Shipper to the Carrier or his agents.

## EXHIBIT C

RECEIVED

SEP 2 1 2006

EDDIE BAUER
LEGAL DEPARTMENT

## "K" LINE SERVICE CONTRACT - SC NO. 14372

ESSENTIAL TERMS ("ET") PUBLICATION : KKLU-152
ESSENTIAL TERMS NO.: 14372
ET No.:
TARIFFS OF GENERAL APPLICABILITY  : KKLU-143, 129

This Service Contract ("Contract") is made and concluded this day of  April 12, 2005, by and between "K" Line, an ocean common carrier ("Carrier") and  Eddie Bauer Fulfillment Services, Inc. (hereinafter "Shipper"), whereby the parties mutually agree as set forth in Appendix A -     attached hereto. IN WITNESS WHEREOF, the parties have executed this Contract through their responsible representatives duly authorized as of the dates hereinafter written, SUBJECT TO ARBITRATION CLAUSE IN CLAUSE XII

_____
(Signature)          Date
T.Y. Cheng
Vice President

Import Marketing/Pricing
"K" Line America Inc.
as agents for Kawasaki Kisen Kaisha
8730 Stony Point Parkway, Suite 300
Richmond, VA 23233
Tel  (804) 560 3100
Fax (804) 560 3600

_____
(Signature)          Date     8-18-05
Bill Terry
Director of Transportation

Eddie Bauer Fulfillment Services, Inc
6600 Alum Creek Dr.
Groveport OH, 43125


Tel No: 614-497-8200
Fax No: 614-497-2120

Affiliates of Shipper
Covered by this Contract:Refer to Appendix A


Shipper Certification

Pursuant to FMC regulation 46 C.F.R. 530.6 Shipper, by execution of this Contract, certifies its status and that of all its affiliates authorized to utilize this Contract as:
(1)_____XXX_____ cargo owner or consignee; (2) _____
other (specify:_____); or (3)_____ signatory acting as Ocean Transport Intermediary(ies). If status is #3 above, Shipper further certifies that any such OTIs have tariff(s) and bond(s) on file with the FMC in full compliance with FMC regulations and that copies of tariff pages reflecting same have been provided to Carrier.

## "K" LINE SERVICE CONTRACT - SC NO. 14372

ESSENTIAL TERMS ("ET") PUBLICATION : KKLU- 152
ESSENTIAL TERMS NO.: 14372
ET No.:
TARIFFS OF GENERAL APPLICABILITY  : KKLU-143, 129

This Service Contract ("Contract") is made and concluded this day of  April 29, 2005,
by and between "K" Line, an ocean common carrier ("Carrier") and  Distribution
Fulfillment Services, Inc.  (hereinafter "Shipper"), whereby the parties mutually agree
as set forth in Appendix A -    attached hereto. IN WITNESS WHEREOF, the parties
have executed this Contract through their responsible representatives duly authorized as
of the dates hereinafter written, SUBJECT TO ARBITRATION CLAUSE IN
CLAUSE XII

| | |
|---|---|
| (Signature)            Date | (Signature)            Date |
| T.Y. Cheng | Bill Terry |
| Vice President | Director of Transportation |
| Import Marketing/Pricing | |
| "K" Line America Inc. | Distribution Fulfillment Services, Inc. |
| as agents for Kawasaki Kisen Kaisha | 6600 Alum Creek Dr. |
| 8730 Stony Point Parkway, Suite 300 | Groveport OH, 43125 |
| Richmond, VA 23233 | |
| Tel  (804) 560 3100 | |
| Fax (804) 560 3600 | Tel No: 614-497-8200 |
| | Fax No: 614-497-2120 |

Affiliates of Shipper
Covered by this Contract:Refer to Appendix A

Shipper Certification

Pursuant to FMC regulation 46 C.F.R. 530.6 Shipper, by execution of this Contract,
certifies its status and that of all its affiliates authorized to utilize this Contract as:
(1)_____XXX_____ cargo owner or consignee; (2) _____
other (specify:_____); or (3)_____ signatory acting as Ocean
Transport Intermediary(ies). If status is #3 above, Shipper further certifies that any
such OTIs have tariff(s) and bond(s) on file with the FMC in full compliance with FMC
regulations and that copies of tariff pages reflecting same have been provided to Carrier.

Final "K" Line Contract Boilerplate

SERVICE CONTRACT NO. ___14372_____

The parties, Kawasaki Kisen Kaisha, Ltd., Hibiya Central Building, 2-9, Nishi-Shinbashi 1-Chome, Minato-Ku, Tokyo 105, Japan, a Japanese corporation ("Carrier") and Distribution Fulfillment Services, Inc., a U.S. corporation ("Shipper") hereby agree to the following terms and conditions governing carriage of Shipper's cargoes on Carrier's Vessels.

I. PARTIES. The Shipper is deemed to include the corporation signing this Contract and all its affiliates listed (by name and business address) in Appendix A hereto, together with verification of shipper status. Carrier is Kawasaki Kisen Kaisha, Ltd., and its Vessels shall be deemed to include any vessel on which it has chartered space or slots.

II. GOVERNING TARIFFS: All cargoes moving hereunder, unless otherwise provided herein, shall be subject to the common group rates, charges, or rules as applicable at time of shipment contained in the governing "K" Line Tariff(s) listed on the signature page of the contract.

III. TERM. The term of this Contract shall be from its Effective Date under Federal Maritime Regulations or on the first day of the Term as shown in Appendix A hereto (whichever is later) and shall end as per Appendix A.

IV. PARTIES OBLIGATIONS.

A. Shipper agrees to ship a minimum quantity of containers containing commodities as shown in Appendix A hereto (the "MQC") during the Term of this Contract from the Origins and to the Destinations port ranges, ports or points (for through intermodal services, Origin and Destination geographic areas) listed in Appendix A at the rates specified in Appendix A and, except as otherwise specified herein, subject to the rules and charges provided in Carrier's governing Tariff covering the Origins and Destinations, as in effect at time of receipt by Carrier. A 40-ft or 45' ft. container shall count as two TEUs.

B. Carrier agrees to carry, from the Origins to the Destinations, the MQC of cargoes which Shipper is the beneficial owner, consignee, the person paying for the ocean transportation, or is an NVOCC or member of a Shipper's Association where applicable, at the rated in Appendix A, subject to applicable rules and charges as noted above. Any additional quantity of such

cargoes carried by Carrier during the Term of this contract shall be carried under the terms of this Contract.

V.   SERVICE COMMITMENT.  Carrier agrees to carry the MQC of Shipper's containers on its scheduled Vessels during the Term, upon seven- (7) day's notice prior to scheduled sailing, from the Origins to the Destinations.

VI.   VERIFICATION.  Each original Bill of Lading governing individual shipments under this Contract and all copies thereof shall bear a notation showing the service contract number of this Contract.  The designation by Shipper of cargo as Contract cargo by affixing the Contract number on the bill of lading shall be made at the time of the issuance of the bill of lading and shall be final, absent inadvertent error.  Shipper agrees to submit promptly to the Carrier, on a monthly basis, statements of the quantity of cargo shipped under this Contract, the statements to be in writing supported by a copy of the Bills of Lading.

VII.   FORCE MAJEURE.  In the event force majeure circumstances, including work stoppages, strikes, accidents, casualties, lockouts, fire, road, marine or rail disasters, acts of God, governmental restraints, war or hostilities, embargoes or other similar conditions, but not commercial contingencies (e.g., changing markets, poor management decisions, business declines, bankruptcy of a customer or of a supplier, etc.), the Shipper or Carrier shall notify the other party in writing within seven (7) working days of the existence of such circumstances and of the effect on its ability to perform its obligations hereunder and shall immediately notify the other party of the cessation of the force majeure conditions.  Upon receipt of such notice of force majeure conditions, the parties shall be excused from their obligations under this Contract to the extent of and for the duration of the disability.

VIII.   BILL OF LADING PROVISIONS.  All terms and conditions (front and back) of Carrier's applicable Bill of Lading form (Standard Form for Container Trades), as effective upon cargo receipt and as contained in Carrier's Tariff at the time of receipt, shall apply to all shipments hereunder, notwithstanding any term of this Contract.7

IX.   DAMAGES.  Unless other wise specified in the contract, for every TEU below the MQC or sub-MQC which Shipper tenders timely to Carrier during the Term of this Contract, Shipper shall pay Carrier one hundred and fifty U.S. dollars ($150) as liquidated damages, which liquidated damages are necessary due to the difficulty of assessing the serious damage suffered by Carrier from the loss of such business.  Payment to be made within thirty (30) days from the dated Carrier sends Shipper written notice of the amount due.  If Carrier fails to carry containers tendered

timely by Shipper, Shipper shall be entitled to a reduction in the MQC by the amount of the shortfall, or extension of this Contract by prorating the MQC over the term of this Contract and extending by an amount of time equal to the prorated portion of the Term during which such containers would have been carried. Neither party is liable for any damages other than as stated herein.

X.  FILING. This Contract and amendments, and its Essential Terms, shall be filed and published, respectively, required by the FMC and shall be subject to all FMC Regulations.

XI.  CONTRACT RECORDS. The Carrier's Bills of Lading, the Shipper's statements of cargo shipped under this Contract, written communications issued by Carrier regarding such statements, and force majeure correspondence and notices, shall constitute the records supporting performance under this Contract. Any requests from the Federal Maritime Commission for shipment records under this Contract should be submitted to the Carrier at the address shown on the signature page hereof.

XII.  DISPUTES / APPLICABLE LAW. The substantive law of the State of New York shall govern this Contract and the parties submit to the jurisdiction of the U.S. District Court for the Southern District of New York for all purposes. Any dispute shall be settled exclusively by arbitration at New York by a single arbitrator chosen by the parties or selected by the U.S. District Court, under the Rules of the Society of Maritime Arbitrators. The arbitrator's award may be confirmed in any court of competent jurisdiction and shall be enforceable under the United Nations Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958.

XIII.  ASSIGNMENT. Neither party may assign this Contract.

XIV.  ENTIRE CONTRACT. This Contract constitutes the sole agreement between the parties concerning the subject matter, and supersedes any other agreement. Appendices — through — are incorporated herein by reference.

XV.  TERMINATION. After the MQC and sub-MQC (if any) are met, either party may terminate on ten (10) business days written notice. In the event of termination for other reasons, all shipments will be rerated as required by FMC Regulations.

XVI.  CERTIFICATION. Shipper warrants that the certification of shipper status by it and all affiliates or members entitled to utilize this Contract is true and correct and any change will be communicated immediately to Carrier.

GOVERNING TARIFF: KKLU-129, 143.
KLINE Standard BP
Special Terms: Yes

Kawasaki Kisen Kaisha Ltd. ("K" Line) /
Distribution Fulfillment Services Inc. (DFS)
2005 Service Contract No. 14372

The following provisions of this Appendix are incorporated in the above referenced
service contract. References herein to "Articles" shall refer to provisions of the above
referenced service contract ; references herein to "paragraphs" shall refer to
provisions of this Appendix.

1    ORIGIN

Hong Kong
China, People's Republic of
Korea
Taiwan
Philippines
Indonesia
Singapore
Malaysia
Thailand
Vietnam
Cambodia
India
Sri Lanka
Bangladesh

2    DESTINATION

USA

3    COMMODITIES

A) Catalog Store Merchandise including Apparel, Textiles, Footwear, Fashion
Accessories but excluding Reefer Cargo, Dangerous/Hazardous Cargo or
Cargo requiring Special Containers.

4    MINIMUM QUANTITY OR PORTION

600 FEUs

4.1    SUB-MINIMUM QUANTITY COMMITMENTS :
Volume to be shipped between Nov. 1, 2005 to April 2006.

100 FEUs

5    SERVICE COMMITMENTS

The service commitment applicable hereto is set forth
in Article V of the Service Contract Boiler Plate

6    RATES OR RATE SCHEDULE(S)

| Origin | O-Via | Destination | D-Via | Svc | omin | 20 | 40 | 40H | 45 | Notes |
|--------|-------|-------------|-------|-----|------|-----|-----|------|-----|-------|
| Hong Kong | | | | | | | | | | |
| Kaohsiung, Taiwan | | Columbus, OH | us west c | YD | A | 2800 | 3730 | 4195 | 4720 | 1 |
| Keelung, Taiwan | | Columbus, OH | us west c | YD | A | 2800 | 3730 | 4195 | 4720 | 1 |
| Busan, Korea | | Columbus, OH | us west c | YD | A | 2855 | 3805 | 4280 | 4815 | 1 |
| Yantian, PRC | | Columbus, OH | us west c | YD | A | 2800 | 3730 | 4195 | 4720 | 1 |
| | | Columbus, OH | us west c | YD | A | 2800 | 3730 | 4195 | 4720 | 1 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Shanghai, PRC | Columbus, OH | us west c | YD | A | 2890 | 3855 | 4335 | 4880 | 1 |
| Xingang, PRC | Columbus, OH | us west c | YD | A | 2965 | 3955 | 4450 | N/A | 1 |
| Dalian, PRC | Columbus, OH | us west c | YD | A | 2965 | 3955 | 4450 | N/A | 1 |
| Qingdao, PRC | Columbus, OH | us west c | YD | A | 2890 | 3855 | 4335 | 4880 | 1 |
| Xiamen, PRC | Columbus, OH | us west c | YD | A | 2965 | 3955 | 4450 | 5005 | 1 |
| Ningbo, PRC | Columbus, OH | us west c | YD | A | 2965 | 3955 | 4450 | 5005 | 1 |
| Fuzhou, PRC | Columbus, OH | us west c | YD | A | 3150 | 4200 | 4725 | 5315 | 1 |
| Manila, Philippines | Columbus, OH | us west c | YD | A | 3040 | 4050 | 4555 | 5125 | 1 |
| Jakarta, Indonesia | Columbus, OH | us west c | YD | A | 3095 | 4125 | 4640 | 5220 | 1 |
| Surabaya, Indonesia | Columbus, OH | us west c | YD | A | 3190 | 4255 | 4785 | 5385 | 1 |
| Semarang, Indonesia | Columbus, OH | us west c | YD | A | 3190 | 4255 | 4785 | 5385 | 1 |
| Singapore | Columbus, OH | us west c | YD | A | 2875 | 3830 | 4310 | 4850 | 1 |
| Penang, Malaysia | Columbus, OH | us west c | YD | A | 3080 | 4105 | 4620 | 5195 | 1 |
| Port Klang, Malaysia | Columbus, OH | us west c | YD | A | 3040 | 4055 | 4560 | 5135 | 1 |
| Bangkok, Thailand | Columbus, OH | us west c | YD | A | 3130 | 4175 | 4695 | 5285 | 1 |
| Laem Chabang, Thailand | Columbus, OH | us west c | YD | A | 3130 | 4175 | 4695 | 5285 | 1 |
| Ho Chi Minh City, Vietnam | Columbus, OH | us west c | YD | A | 3325 | 4430 | 4985 | 5610 | 1 |
| Haiphong, Vietnam | Columbus, OH | us west c | YD | A | 3325 | 4430 | 4985 | 5610 | 1 |
| Sihanoukville, Cambodia | Columbus, OH | us west c | YD | A | 3380 | 4505 | 5070 | 5705 | 1 |
| Nhava Sheva, India | Columbus, OH | us west c | YD | A | 3360 | 4480 | 5040 | N/A | 1 |
| Colombo, Sri Lanka | Columbus, OH | us west c | YD | A | 3360 | 4480 | 5040 | N/A | 1 |
| Chittagong, Bangladesh | Columbus, OH | us west c | YD | A | 3360 | 4480 | 5040 | N/A | 1 |
| Mumbai, India | Columbus, OH | us west c | YD | A | 3360 | 4480 | 5040 | N/A | 1 |
| Chennai, India | Columbus, OH | us west c | YD | A | 3360 | 4480 | 5040 | N/A | 1 |

"YY " = CY/CY delivery.
"YD " = CY/Door delivery. Unless otherwise specified only live-unloading is applicable.

Note 1:
The above contract rates are inclusive of the following charges,

- Currency Adjustment Factor
- Destination Delivery Charge
- Chassis Charge.
- Peak Season Surcharge.

but subject to all the other charges published in the governing
tariff such as followings :

- Origin Terminal Handling Charge
- Documentation Fee
- Shanghai Port Surcharge
- Fuel Adjustment Factor/Bunker Charge.
- Alameda Corridor Charge.
- Cargo Declaration Data Charge.
- Carrier Security Charge $6 per container.

6.1   ARBITRARIES:

The Arbitraries over the Contract rates for the
origins noted herein (except when there is a
through rate shown) are as follows:
1) In U.S. Dollars, except as specified.

| | Rate over: | P'C | D20 | D40 | 40H | D45 |
|---|---|---|---|---|---|---|
| Zhongshan | HK | | 300 | 400 | 450 | 525 |
| Guangzhou, China | HK | | 245 | 325 | 365 | 410 |
| Huangpu, China | HK | | 280 | 375 | 420 | 475 |
| Macau | HK | | 525 | 700 | 790 | 885 |
| Shenzhen, China | HK | 200 | | | | |
| Lat Krabang, Thailand | Laem Chabang | | 0 | 0 | 0 | 0 |

7   LIQUIDATED DAMAGES FOR NON-PERFORMANCE, IF ANY

The Liquidated damages hereunder are set forth in
Article IX of Service Contract Boiler Plate.

8   DURATION OF THE CONTRACT

Duration:                          12 months

Effective Date :                   May 1, 2005

Expiration Date :                  April 30, 2006

9   SIGNATURE DATE / CONTRACT PARTIES / SIGNATORIES AND ANY AFFILIATES

Shipper:                           Distribution Fulfillment Services Inc. (DFS)

Affiliate(s):                      Eddie Bauer Inc.
                                   15010 N.E. 36th Street, Redmond, WA 98052

10  SHIPPER STATUS CERTIFICATION
    BCO

11  RECORDS

The maintenance of contract records hereunder are set forth in
Article XI of Service Contract Boiler Plate.

102-1 FREE TIME

A) Free Time at DIT in Columbus, OH (NS Ramp) :
   Free Time and Demurrage Charge at DIT are per the tariff of
   terminal operator as follows :-
    Free Time :
   Day of notification plus 3 working days (Saturday/Sunday excluded).
   Demurrage Charge :
   In the event the free time set forth above expires, the following demurrage
   charge will apply :-
   First 9 days - $75 per container per calendar day.
   10th day and thereafter - $100 per container per calendar days.

   Carrier will give Shipper 30 days notice in case there are changes to the
   free time and/or demurrage charge in terminal operator's tariff.

B) Free Time at SDD Location - Free time for purposes
   of equipment usage charges at the SDD location will be 7
   calendar days. Free time shall commence at 8 a.m. on
   the first business day after removal of the container from the D.I.T.

   In the event the free time set forth above expires, per diem charge/
   detention charge shall apply per "K" Line governing tariff.

199 Others
   Shipment of garment on hanger (GOH) is subject to GOH charge $500/20', 650/40', 730/HC.

********************

## EXHIBIT D



## KAWASAKI KISEN KAISHA, LTD. COMBINED TRANSPORT

# BILL OF LADING TERMS
# EXPORT - BACK

1. ( **Definitions & Tariff** )

   (1) In this Bill of Lading the words and expressions specified below shall have the meanings attributed to them below:

   1. "Carriage" means the whole or any part of the operations and services undertaken by Carrier in respect of Goods covered under this Bill of Lading.
   2. "Carrier" means KAWASAKI KISEN KAISHA, LTD., Vessel, her owners, operators and charterers whether acting as carrier or bailee.

   3. "Combined Transport" means Carriage of Goods by Vessel plus one or more other modes of transport under this Bill of Lading from the place of receipt from Merchant to the place of delivery to Merchant.
   4. "Connecting Carrier" means carriers (other than Carrier), contracted by or acting on behalf of Carrier, participating in Carriage of Goods by land, water or air under this Bill of Lading.
   5. "Container" includes any container, trailer, transportable tank, flat or pallet or any similar article used to consolidate Goods and any ancillary equipment.
   6. "Goods" means the whole or any part of the cargo accepted from the shipper and includes the packing and any equipment or Container not supplied by or on behalf of Carrier.
   7. "Holder" means any person for the time being in possession of or entitled to this Bill of Lading by reason of the consignment of Goods or the endorsement of this Bill of Lading or otherwise.
   8. "Merchant" includes the shipper, consignor, consignee, owner and receiver of Goods, and Holder, and anyone acting on behalf of any such person, including but not limited to agents, servants, independent contractors and freight forwarders.
   9. "Sub-Contractor" includes stevedores, longshoremen, terminal operators, warehousemen, watchmen, any Connecting Carrier, and any person, firm, corporation, or other legal entity who or which performs services incidental to carriage of Goods under this Bill of Lading, and their servants, agents and independent contractors.
   10. "Vessel" includes the vessel named on the face hereof, any vessel, lighter, barge, ship, watercraft or any other means of water transport and any other vessel owned, operated, chartered or employed (in whole or in part) by Carrier or any Connecting Carrier and used in whole or in part for Carriage of Goods under this Bill of Lading.
   11. "Water Carriage" means such stage of Carriage of Goods as commencing from the time when Goods are loaded on Vessel and ending at the time when Goods are discharged from Vessel.

   (2) The terms of Carrier's applicable Tariff ("Tariff") are incorporated herein. Merchant's attention is drawn to clause 22 hereof. Copies of the relevant provisions of Tariff are obtainable from Carrier upon request. In the case of inconsistency between this Bill of Lading and Tariff, this Bill of Lading shall prevail.

2. ( **Governing Law and Jurisdiction** )The contract evidenced by or contained in this Bill of Lading shall be governed by Japanese law except as may be otherwise provided for herein,

and any action thereunder or in connection with Carriage of Goods shall be brought before the Tokyo District Court in Japan, to whose jurisdiction Merchant irrevocably consents.

3. **Responsibility (All Trade other than to, from or through US Territories)** Except for the shipment of Goods to, from or through the United States, including its districts, territories and possessions (collectively called "US Territories"), which shall be governed by Clause 4 below, the following shall apply:

   1. (Responsibility When Loss Or Damage Proven To Have Occurred During Water Carriage) (1) Carrier's responsibility, if any, for any loss or damage to Goods proven to have taken place during Water Carriage shall be governed by the Law Concerning Carriage of Goods by Sea of Japan as amended in 1992 (Japan COGSA), but if for some reason, that should be held not to apply, then by the International Convention for the Unification of Certain Rules Relating to Bills of Lading, dated at Brussels, 25 August, 1924 (Hague Rules) as amended by the Protocol to Amend the International Convention, signed at Brussels on 23 February, 1968 (Hague-Visby Rules) and the Protocol to the International Convention signed at Brussels on 21 December, 1979 amending the unit of account to be the Special Drawing Right as defined by the International Monetary Fund (SDR Protocol). (2) But if this Bill of Lading is adjudicated in a court having jurisdiction in a locality where there is in force a compulsorily applicable Act, Ordinance or Statute, it shall be subject to the provisions of such applicable Act, Ordinance or Statute but no further. (3) If a court of competent jurisdiction deems the United Nations Convention on the Carriage of Goods by Sea, 1978 (Hamburg Rules) to be compulsorily applicable then this Bill of Lading will be subject to Hamburg Rules, and only in such circumstances will any provision, stipulation or clause (or portion thereof) in this Bill of Lading that derogates from the provisions of Hamburg Rules be null and void, but only to the extent it derogates from Hamburg Rules.

   2. (Responsibility Other Than During Water Carriage) (1) Carrier's responsibility, if any, for any loss or damage to Goods proven to have taken place during any period other than Water Carriage shall be governed by any relevant provisions contained in any applicable international convention or national law which provisions (a) cannot be departed from by private contract to the detriment of Merchant; and (b) would have applied if Merchant had made a separate and direct contract with Carrier in respect of the particular stage of Carriage during which the loss or damage occurred. (2) In no event, however, shall Carrier have liability with respect to any loss or damage to Goods unless caused by the actual fault or negligence of Carrier, Sub-Contractors, or any master, officers, crew, employees, servants, agents or independent contractors who perform(s) service incidental to Carriage of Goods nor shall Carrier have any liability with respect to any loss or damage to Goods caused in whole or in part by (I) Act of God, (II) Act of war or act of public enemies, (III) Arrest or restraint of princes, rulers or people, or seizure under legal process, (IV) Quarantine restriction, (V) Act or omission of Merchant, (VI) Insufficiency of or defective packing or marking, (VII) Handling, loading, stowage or unloading of Goods by or on behalf of Merchant, (VIII) Inherent vice of Goods, (IX) Strike, lock-out, stoppage or restraint of labour, from whatever cause, whether partial or general, (X) Any cause or event which Carrier could not avoid and the consequences whereof Carrier could not prevent by the exercise of reasonable diligence,(XI) Compliance with the instructions of any person entitled to give them. (3) In no event shall Carrier's liability, if any, during this period exceed US$2.00 per kilo of the gross weight of Goods lost or damaged.

   3. (Responsibility When Stage Of Carriage During Which Loss or Damage Occurred Is Unproven) If the stage of Carriage during which loss or damage occurred is not proven by Merchant, then Carrier's responsibility, if any, shall be determined in accordance with Clause 3 (B)(2) and (3) above instead of 3(A).

4. ( **Responsibility For Shipments To, From Or Through US Territories** ) (1) With respect to Goods shipped to, from or through US Territories, Carrier's responsibilities during the entire period (and not just during Water Carriage) from the time of receipt of Goods to the time of delivery of Goods shall be governed by the United States Carriage of Goods by Sea Act (US COGSA) and US COGSA shall be deemed incorporated herein during the entire aforesaid period, provided however that if loss or damage to Goods is proven to have occurred during other than Water Carriage and outside US Territories, Carrier's responsibilities shall be determined in accordance with Clause 3(B) instead of US COGSA. (2) If US COGSA so applies then with respect to Goods carried on deck and stated on the face hereof to be so carried, and with respect to live animals birds, reptiles, fish, shellfish and plants, all risk or loss or damage by perils inherent in or incidental to such Carriage shall be borne by Merchant, and all such Goods whether carried on deck or under deck shall participate in general average, but in all other respects in connection with the custody and Carriage of such Goods, Carrier shall have the benefit of the provisions of US COGSA, notwithstanding Section I(c) thereof, and of all the terms and conditions of this Bill of Lading except those inconsistent with the provisions of this Clause. (3) Also, if US COGSA so applies, in no event shall Carrier be or become liable for any loss or damage to or in connection with Carriage of Goods in an amount exceeding US$500 per package lawful money of USA, or in case of Goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such Goods have been declared by the shipper before receipt of Goods by Carrier and inserted in this Bill of Lading.

5. ( **Sub-Contracting: Exemptions, Immunities, Limitations, etc. of Participant(s)** ) (1) Carrier shall be entitled to sub-contract on any terms whatsoever Carriage, including without limitation, the loading, unloading, storing, warehousing, handling and any and all duties whatsoever undertaken by Carrier in relation to Goods by any of the following: (I) any Connecting Carrier, (II) masters, officers, crew, employees or any other servants, of Carrier and Connecting Carrier, (III) sub-contractors, stevedores, longshoremen, terminal operators, warehousemen, watchmen, agents and independent contractors whatsoever used or employed by Carrier from time to time in connection with the performance of any of Carrier's obligations under this Bill of Lading (all of the foregoing are hereafter referred to as "Participant(s)"). (2) Merchant undertakes that no claim or allegation shall be made against any of Participants which imposes or attempts to impose upon any of them or any vessel owned or chartered by any of them any liability whatsoever in connection with Goods or Carriage of Goods, whether or not involving the negligence of any such person, and, if any such claim or allegation should nevertheless be made, to indemnify Carrier against all consequences thereof. Without prejudice to the foregoing, every such vessel and Such Participant(s) shall have the benefit of all provisions herein benefiting Carrier as if such provisions were expressly for their benefit; and, in entering into this contract, Carrier, to the extent of those provisions, does so not only on its own behalf, but also as agent and trustee for such vessel and Participant(s). (3) Merchant further undertakes that no claim or allegation of any nature whatsoever in respect of Goods shall be made against Carrier or any person entitled to the benefit of clauses 5(2) and 5(3) by any person, other than in accordance with and subject to the terms of this Bill of Lading, which imposes or attempts to impose upon Carrier or such person any liability whatsoever in connection with Goods or Carriage thereof, whether or not involving the negligence of Carrier or such person, and, if any such claim or allegation should nevertheless be made, to indemnify Carrier against all consequences thereof.

6. ( **Methods and Routes of Carriage** ) It is understood and agreed that (a) Carriage of Goods may be done by more than one method or route of transport (whether or not direct, customary or advertised), including, but not limited to transport by land, water and air and by more than one Vessel or other means of transport; (b) no method or route of transport nor Vessel nor any other means of transport is agreed to be used and the same, at any time, may be changed or substituted without notice from those originally intended by Carrier; (c) Goods or any part thereof may be discharged and/or stored at any port or place, whether

named or not; (d) Carrier may pack or unpack Goods into or out any type of Container or other means of packaging or shipment; (e) Carrier may carry Goods in one or more shipments at one or more times; (f) Vessel or other means of transport, whether or not Goods are then on board, is at liberty to adjust navigational instruments, make trial trips or tests, drydock or be repaired, shift berths, take in fuel or other necessaries, embark or disembark passengers, crew, cargo or stores, sail with or without pilots, tow or be towed, or save or attempt to save life or property or to be guided by weather conditions.

7. ( **Period of Responsibility/No Undertaking of Arrival Time** ) (1) Carrier shall not be responsible for any loss or damage to Goods howsoever occurring, if such loss or damage occurring prior to receipt of Goods by Carrier or after delivery of Goods by Carrier. (2) Carrier does not undertake that Goods shall arrive at the port of discharge or place of delivery at any particular time or in time to meet any particular market or use, and Carrier shall not be responsible for any direct or indirect loss or damages which is caused through delay.

8. ( **Liberties** ) (1) In any situation, whether existing or anticipated prior to or during Carriage, which, in the judgment of Carrier and/or any person charged with Carriage or safekeeping of Goods, has caused or may cause danger, injury, loss, delay or disadvantage to Vessel, Carrier, Goods, any person and/or any property, Carrier shall be entitled, have the liberty and in the manner it deems advisable, as an agent for and at the sole risk and expense of Merchant, to: (a) unpack Container(s) or dispose of Goods; (b) prior to loading, cancel the contract of carriage without compensation and require Merchant to take delivery of Goods, or place Goods in a warehouse or other place; (c) once Goods are laden or shipped on board, discharge Goods, or any portion thereof, at any place selected by Carrier at its sole discretion, or back at the port of loading or place of receipt. Actions undertaken pursuant to (a) (b) or (c) shall constitute full performance of this contract, and Carrier shall be released from any and all responsibility and liability hereunder. (2) Carrier shall make all arrangements authorized in accordance with (1) above without any liability whatsoever in respect to such agency and/or actions, and shall acquire a lien upon Goods therefor; and upon demand, Merchant shall reimburse Carrier for all extra freight, charges and expenses incurred thereby. (3) The situations referred to in (1) above include, but are not limited to, those caused by war declared or undeclared, hostile, warlike, belligerent acts, disturbances, riots, civil commotions; closure, obstacles, dangers in or to any canal; blockade of any port or place, interdiction, prohibition, restriction of trade or commerce; quarantine, health, sanitary regulations or restrictions; epidemics, diseases; strikes, lockouts or other labour problems, congestion at any port, wharf, sea terminal or other place; shortage, absence, obstacles of available labour or facilities for loading, discharge, delivery, handling of Goods; bad weather, shallow water, ice, landslip or other transportation obstacles. (4) Carrier shall also have the liberty to comply with orders, directions, regulations, recommendations as to departure, arrival, route, places of call, stoppage, loading, discharge, handling, delivery or any other important factor given by any public authority or under the terms of any insurance on Vessel, and any such compliance shall not be a deviation but shall be deemed to be included within the contractual Carriage.

9. ( **Unknown Clause** ) (1) Any reference on the face hereof to marks, numbers, description, quality, quantity, gauge, weight, measure, nature, kind, value and any other particulars of Goods is as furnished by Merchant, with respect to which Carrier does not make any representation, nor shall Carrier be under any responsibility whatsoever in respect of such description or particulars. (2) Merchant warrants to Carrier that the particulars furnished by him are correct, and shall indemnify Carrier against all loss, damage, expenses, liability, penalties and fines arising or resulting from inaccuracy thereof.

10. ( **Carrier's Container** ) (1) Merchant shall assume full responsibility for and shall indemnify Carrier against any loss of or damage to Container(s) and other equipment provided by or on behalf of Carrier, which occurs while in the possession or control of Merchant, or agents, servants, contractors or any other persons engaged by or on behalf of Merchant. (2) Carrier shall in no event be liable for and Merchant shall defend, indemnify and hold Carrier

harmless from and against any loss, damage, liability, cost or expense, including attorneys' fees, arising out of or in any way connected with loss of or damage to any property of Carrier and others or injuries or death of any person caused by Container(s) or other equipment provided by or on behalf of Carrier, or the contents thereof, during handling by, or while in the possession or control of Merchant, or agents, servants, contractors or any other persons engaged by or on behalf of Merchant, whether or not contributed by the negligence, breach of express or implied warranty, strict liability or otherwise of Carrier or any other person other than Merchant.

11. ( **Container Packed by Merchant** ) If Goods received by Carrier are in Container(s) into which contents have been packed by or on behalf of Merchant, Merchant warrants that the stowage and securing of the contents of Container(s) and their closing and sealing are safe and proper and also warrants that Container(s) and contents thereof are suitable for Carriage in accordance with the terms hereof including Clause 15. In the event of Merchant's breach of said warranties, Carrier shall not be responsible for any loss of or damage to or in connection with Goods and Merchant shall be liable for loss of or damage to any property, or for personal injury, death or the consequences of any other accidents or events whatsoever and shall defend, indemnify and hold Carrier harmless against all loss, damage, liability, cost or expense, including attorneys' fees, arising out of or in any way connected with said accidents or events. Merchant shall inspect Container(s) when the same are furnished by or on behalf of Carrier, and they shall be deemed to have been accepted by Merchant as being in sound and suitable condition for the purpose of Carriage contracted herein.

12. ( **Inspection of Contents/Container Seals** ) (1) Carrier shall be at liberty to open Container(s) and to inspect Goods and take any measures with respect thereto without notice to Merchant at such time and place as Carrier may deem necessary and all expenses incurred therefrom shall be borne by Merchant if such expenses relate to Container(s) packed by Merchant, or were incurred by a reason for which Merchant should be responsible. (2) If Container(s) are delivered by Carrier with seals intact, such delivery shall be deemed as full and complete performance of Carrier's obligation hereunder and Carrier shall not be liable for any loss of or damage to the contents of Container(s). (3) In case the seals of Container(s) are broken by or pursuant to the order of the customs or other authorities, Carrier shall not be liable for any loss, damage, expenses or any other consequences arising or resulting therefrom.

13. ( **Special Container** ) (1) Carrier undertakes to carry Goods in refrigerated, heated, insulated, ventilated or any other special Container(s) only by special arrangement in writing and only when special freight as required is paid. (2) Notwithstanding anything contained in this Bill of Lading, Carrier shall not be responsible for the function of any special Container(s) provided that Carrier exercises due diligence before or at the beginning of Carriage of special Container(s) to determine that special Container(s) is then in good working order. (3) Except as provided in (2) above, Carrier shall not be liable for any loss of or damage to Goods arising from latent defects, derangement, breakdown, or stoppage of the refrigerating machinery, plant, insulation and/or any apparatus of Container, Vessel, or other means of transport or conveyance and any other facilities. (4) In the case of refrigerated or special Containers packed by Merchant, Merchant shall properly prepare and pack Goods for such shipment and set the temperature, as required. (5) The maintenance of the temperature within a refrigerated or special Container is not guaranteed by Carrier and is solely at Merchant's risk, even if a particular temperature is stated on the face hereof and irrespective of whether Container is packed or the temperature is set by Carrier or Merchant. (6) Merchant shall have contents at the requested temperature setting prior to packing into a refrigerated Container whether same is to be packed by Merchant or Carrier.

14. ( **Dangerous Goods, Contraband** ) (1) Carrier undertakes to carry Goods of an explosive, inflammable, radioactive, corrosive, damaging, noxious, hazardous, poisonous, injurious or any other dangerous nature only upon Carrier's acceptance of a prior written application by Merchant for Carriage of such Goods. Such application must accurately state the nature, name, label and classification of Goods as well as the method of rendering them innocuous,

with the full names, addresses and telephone numbers of Merchant. (2) Merchant shall undertake that the nature of Goods referred to in (1) above is distinctly and permanently marked and manifested on the outside of the package(s) and Container(s) and shall also undertake to submit the documents or certificates required by any applicable statutes or regulations at any stage of Carriage or by Carrier. (3) Whenever Goods are perceived or are discovered to pose a threat to Vessel, any other means of transport, cargoes, properties or persons, or not to comply with (1) or (2) above, or Goods are perceived or found to be contraband or prohibited by any laws or regulations of the port of loading, discharge or call or any place or waters during Carriage, Carrier shall be entitled to have such Goods rendered innocuous, thrown overboard or discharged and left to Merchant at any stage and place Carrier may choose or otherwise dispose of at Carrier's discretion without compensation, and Merchant shall be liable for and indemnify Carrier against all of loss, damage or liability including loss of freight, and any expenses directly or indirectly arising out of or resulting from such Goods, and shall post any necessary bonds or financial guarantinees as may be required.

15. ( **Stowage Under and On Deck** ) Goods, whether in Container(s) or not, may be carried on deck or under deck without notice to Merchant and without any note, mark or stamp making any statement of "on-deck stowage" on the face hereof. All such Goods whether carried on deck or under deck, shall participate in general average. With respect to Goods carried on deck and stated on the face hereof to be so carried, all risk of loss of or damage to Goods shall be borne by Merchant, whether or not caused by Carrier's negligence or Vessel's unseaworthiness, and Carrier shall have the benefit of all the provisions of this Bill of Lading, except those inconsistent with the provisions of this Clause.

16. ( **Live Animals and Plants** ) Notwithstanding any other provision herein, Carrier shall not be responsible for any accident, disease, mortality, loss of or damage to live animals, including but not limited to birds, reptiles, fish and shellfish, and plants arising or resulting from any cause whatsoever including Carrier's negligence or Vessel's unseaworthiness and shall have the benefit of all the provisions of this Bill of Lading, except those inconsistent with the provisions of this Clause.

17. ( **Valuable Goods** ) Carrier shall not be liable to any extent for any loss of or damage to or in connection with platinum, gold, silver, jewelry, precious stones, precious metals, radioisotopes, precious chemicals, bullion, specie, currency, negotiable instruments, securities, writings, documents, pictures, works of art, curios, heirlooms, collections of every nature or any other valuable goods whatsoever including Goods having particular value only for Merchant, unless the true nature and value of Goods have been declared in writing by Merchant before receipt of Goods by Carrier, and the same is inserted in this Bill of Lading and ad valorem freight has been prepaid.

18. ( **Heavy Lift** ) (1) The weight of a single piece or package exceeding one metric ton gross must be declared by Merchant in writing before receipt by Carrier and must be marked clearly and durably on the outside of the piece or package in letters and figures with the proper lifting points. (2) In case of Merchant's failure in his obligations under (1) above, Carrier shall not be responsible for any loss of or damage to or in connection with Goods, and Merchant shall be liable for loss of or damage to any property or for personal injury or death arising as a result of Merchant's said failure and shall indemnify, defend and hold Carrier harmless against all loss or liability suffered or incurred by Carrier as a result of such failure.

19. ( **Notification and Delivery** ) (1) Any mention in this Bill of Lading of parties to be notified of the arrival of Goods is solely for information of Carrier, and failure to give such notification shall not involve Carrier in any liability nor relieve Merchant of any obligation hereunder. (2) Merchant shall take delivery of Goods within the time provided for in Tariff. (3) If Merchant fails to take delivery of Goods or part of them in accordance with this Bill of Lading, Carrier may without notice unstow Goods or that part thereof and/or store Goods or that part

thereof ashore, afloat, in the open or under cover. Such storage shall constitute due delivery hereunder, and thereupon all liability whatsoever of Carrier in respect of Goods or that part thereof shall cease. (4) Merchant's attention is drawn to the stipulations concerning free storage time and demurrage contained in Tariff, which is incorporated in this Bill of Lading. (5) Carrier may in his absolute discretion receive Goods as Full Container Load and deliver them as Less than Container Load and/or as split delivery of Goods to more than one receiver. In such event Carrier shall not be liable for any shortage, loss, damage or discrepancies of Goods, which are found upon unpacking of Container. Merchant shall be liable for an appropriate adjustment of the freight and shall pay any additional costs incurred. (6) Carrier may in his absolute discretion receive Goods as Less than Container Load and deliver them as Full Container Load. In such event Carrier shall not be liable for any shortage, loss, damage or discrepancies of Goods, which were not apparent at the time of such delivery, provided that it shall have exercised ordinary care in packing Container. (7) If, at the place of delivery, Carrier is required to discharge Goods into the custody of Customs, port or other authority, such discharge into custody shall be due delivery to Merchant under this Bill of Lading. (8) If Goods are unclaimed within a reasonable time but in any event no longer than 7 running days from the date Goods arrive at the port of discharge or place of delivery, or whenever in Carrier's opinion Goods will become deteriorated, decayed or worthless, Carrier may, at its discretion and subject to its lien and without any responsibility attaching to it, sell, abandon or otherwise dispose of such Goods solely at the risk and expense of Merchant.

20. ( **Fire** ) Carrier shall not be responsible for any loss of or damage to Goods arising or resulting from fire occurring at any time throughout Carriage, unless proven to have been caused by the actual fault or privity of Carrier.

21. ( **Lien** ) Carrier shall have a lien on Goods and any documents relating thereto, which shall survive delivery, for all freight, deadfreight, demurrage, damage, loss, charges, expenses and any other sums whatsoever payable by or chargeable to or for the account of Merchant or Goods under this Bill of Lading and any contract preliminary hereto, and for the costs and expenses including attorneys' fees, of recovering the same and may sell Goods privately or by public auction or otherwise exercise a lien on Goods without notice to Merchant. If on sale of Goods, the proceeds fail to cover the amount due and the costs and expenses incurred, Carrier shall be entitled to recover the deficit from Merchant.

22. ( **Freight and Charges** ) (1) Freight may be calculated on the basis of the particulars of Goods furnished by Merchant who shall be deemed to have guaranteed to Carrier the accuracy of the contents, weight, measure or value as furnished by him, at the time of receipt of Goods by Carrier, but Carrier may, at any time, open Container(s) and/or package(s) and examine contents, weight, measure or value of Goods at the risk and expense of Merchant. In case of incorrect declaration of the particulars of Goods as above, Merchant shall be liable for and bound to pay to Carrier (a) the balance of freight between the freight charged and that which would have been due had the correct details been given plus (b) as and by way of liquidated and ascertained damages, a sum equal to the correct freight. (2) Full freight and charges to the port of discharge or place of delivery named herein shall be considered as completely earned on receipt of Goods by Carrier, whether to be prepaid or to be collected at destination. Carrier shall be entitled to all freight and other charges due hereunder, and to receive and retain such freight and charges irrevocably under any circumstances whatsoever, whether Vessel or any other means of transport and/or Goods be lost or not, or Carriage be broken up or frustrated or abandoned at any stage of Carriage. Full freight shall be paid on damaged or unsound Goods. (3) The payment of freight and/or charges shall be made in full and in cash without any offset, counterclaim or deduction. Merchant's attention is drawn to the stipulations concerning currency in which the freight and charges are to be paid, rate of exchange, devaluation and other contingencies relative to freight and charges specified on the face of this Bill of Lading or in Tariff. (4) Merchant shall be liable for, and indemnify Carrier against, all dues, duties, taxes and charges including consular fees levied on Goods, and for all fines and/or loss sustained or

incurred by Carrier in connection with Goods, howsoever caused, including Merchant's failure to comply with laws and regulations of any government or public authority in connection with Goods or failure to procure consular, board of health or other certificate to accompany Goods. Merchant shall be liable for return freight and charges on Goods refused exportation or importation by any government or public authority. If Carrier is of the opinion that Goods stand in need of sorting, inspecting, mending, repairing or reconditioning, or otherwise require protecting or caring for, Carrier may carry out such work at the cost and expense of Merchant. (5) Each Merchant shall be jointly and severally liable to Carrier for the payment of all freight and charges and for the performance of the obligations of each of them hereunder. (6) Payment of freight and charges to a freight forwarder, broker or anyone other than Carrier or its duly authorized agent shall not be deemed payment to Carrier and payment shall be made solely at the payor's risk.

23. ( **Notice of Claim and Time for Suit against Carrier** ) (1) Unless notice of loss or damage and the general nature of such loss or damage be given in writing to Carrier at the port of discharge or place of delivery before or at the time of delivery of Goods or, if the loss or damage be not apparent, within 3 days after delivery, Goods shall be deemed to have been delivered as described in this Bill of Lading. (2) In any event, Carrier shall be discharged from all liability in respect of non-delivery, misdelivery, delay, loss or damage unless suit is brought within one year after delivery of Goods or the date when Goods should have been delivered. (3) Notwithstanding (2) above, with respect of any non-delivery, misdelivery, delay, loss or damage which may have occurred during other than Water Carriage, Merchant must file a claim with Carrier within 9 months after delivery of Goods or the date when Goods should have been delivered, failing which Carrier will be discharged of all liability therefor.

24. ( **Limitation of Liability** ) (1) All claims for which Carrier may be liable shall be adjusted and settled on the basis of Merchant's net invoice cost, plus freight and insurance premium, if paid. (2) Save as otherwise provided herein, Carrier shall in no circumstances be liable for direct or indirect or consequential loss or damage arising from Carriage of Goods hereunder. (3) Under no circumstances shall Carrier be liable for loss or damage in an amount exceeding the amount which can be assessed by Clause 3 or 4, as the case may be, unless the value of Goods higher than the amount so assessed has been declared in writing by Merchant before receipt of Goods by Carrier and inserted on the face hereof with nature thereof and extra freight has been paid as required. (4) Where Goods have been either packed into Container(s) by or on behalf of Merchant, it is expressly agreed that the number of such Container(s) shown on the face hereof shall be considered as the number of the package(s) or unit(s) for the purpose of the application of the limitation of liability provided for herein.

25. ( **Limitation Statutes** ) (1) Nothing in this Bill of Lading shall operate to limit or deprive Carrier of any statutory protection or exemption or limitation of liability authorised by any applicable laws, statutes or regulations of any country. (2) It is agreed by Merchant that Carrier qualifies and shall be regarded as a person entitled to limit liability under any applicable Convention on the Limitation of Liability for Maritime Claims notwithstanding that Carrier may have secured space on board the relevant Vessel by means of a slot charter, bill of lading, waybill or other form of contract of carriage. Subject to any law compulsorily applicable to Carriage to the contrary, and save to that extent, the fund to which Carrier may limit its liability in respect of all claims arising out of an incident shall be that part or proportion of the limitation fund applicable to the actual carrier that is available for Carrier's claims against the actual carrier.

26. ( **Defenses and Limits For Carrier** ) The defences and limits of liability provided for in this Bill of Lading shall apply in any action against Carrier for loss of or damage to the Goods whether the action be founded in contract or in tort or according to any other theory of legal liability

27. ( **Regulations relating to Goods** ) Merchant shall comply with all regulations or requirements of Customs, port and other authorities, and shall bear and pay all duties, taxes, fines, imposts, expenses or losses incurred or suffered by reason thereof or by reason of any illegal, incorrect or insufficient marking, numbering or addressing of Goods, and indemnify the Carrier in respect thereof.

28. ( **General Average; New Jason Clause** ) (1) General average shall be adjusted, stated and settled at Tokyo or any other place as elected by Carrier (or, as the case may be Connecting Carrier) according to York Antwerp Rules 1994 or any amendment thereto and as to matters not provided for by these Rules, according to the laws and usages of the place of adjustment, and in the currency selected by Carrier (or, as the case may be Connecting Carrier). The general average statement shall be prepared by the adjusters appointed by Carrier (or, as the case may be Connecting Carrier). Average agreement or bond and such cash deposit as Carrier (or, as the case may be Connecting Carrier) may deem sufficient to cover the estimated contribution of Goods and any salvage and special charges thereon and any other additional securities as Carrier (or, as the case may be Connecting Carrier) may require shall be furnished by Merchant to Carrier (or, as the case may be Connecting Carrier) before delivery of Goods. (2) Carrier shall be under no obligation to exercise any lien for general average contribution due to Merchant. (3) In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, Carrier is not responsible by statute, contract or otherwise, Goods and Merchant shall jointly and severally contribute with Carrier in general average to the payment of any sacrifices, loss or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of Goods. If a salving ship is owned or operated by Carrier, salvage shall be paid for as fully and in the same manner as if such salving ship belonged to strangers.

29. ( **Both To Blame Collision** ) The Both-To-Blame Collision Clause published by the Baltic and International Maritime Council (BIMCO), a copy of which is available upon request, is hereby incorporated into this Bill of Lading.

30. ( **Miscellaneous** ) (1) The terms of this Bill of Lading are separable, and if any term or condition is, or is held to be invalid, null and void, or unenforceable, such holding shall not affect in any way the validity or enforceability of any other term or condition of this Bill of Lading. (2) No servant or agent of Carrier shall have power to waive or vary any terms of this Bill of Lading unless such waiver or variation is in writing and is specifically authorised or ratified in writing by Carrier. (3) The terms of this Bill of Lading shall govern the responsibility of Carrier in connection with or arising out of the supply of a Container to Merchant whether before or after Goods are received by Carrier for Carriage or delivered to Merchant.

Copyright © 2005, 2006, 2007 by
"K" Line America, Inc.
8730 Stony Point Parkway, Richmond, VA 23235